654 A.2d 1125

Kathleen M. BYRNES

v.

Harry D. CALDWELL, Appellant.

Superior Court of Pennsylvania.

Argued Dec. 6, 1994.

Filed Feb. 9, 1995.

Petition for Allowance of Appeal Granted May 18, 1995.

Francis Recchuiti, Norristown, for appellant.

Peter E. Moore, Spring House, for appellee.

Albert Momjian, Huntingdon, amicus curiae.

Before ROWLEY, President Judge, and CAVANAUGH, WIEAND, CIRILLO, DEL SOLE, POPOVICH, JOHNSON, HUDOCK and SAYLOR, JJ.

ROWLEY, President Judge:

In *Blue v. Blue*, 532 Pa. 521, 616 A.2d 628 (1992), decided on November 13, 1992, our Supreme Court held that a divorced parent, like any other parent, owes a duty of support to his or her child until the later of the child's eighteenth birthday or graduation from high school, but not beyond. Pivotal to the Court's decision was the fact that no parental duty to contribute to a child's post-secondary education had been imposed by the General Assembly despite that body's active involvement in domestic matters via the Divorce Code and Domestic Relations Act.

The following year the General Assembly enacted 23 Pa. C.S. § 4327 ("Act 62") with the stated intention of codifying the decisions of this Court, in *Ulmer v. Sommerville*, 200 Pa.Super. 640, 190 A.2d 182 (1963), and subsequent cases, establishing the obligation of parents who are separated, divorced, unmarried, or otherwise subject to an existing support obligation to contribute, as and where appropriate, to a child's post-secondary education. By its terms Act 62 applies not only to support actions pending at the time of its enactment, but also to support orders in effect on or entered since November 12, 1992, the day before the Supreme Court handed down its decision in *Blue*.

The obligation of appellant Harry D. Caldwell ("Father") to contribute to the support of his college-age daughter, Elizabeth Caldwell, was terminated after the Supreme Court's decision in *Blue* and restored after the legislature's enactment of Act 62. Father's timely appeal from the trial court's order of February 15, 1994, restoring his support obligation has been certified to this Court en banc for resolution of two constitutional issues raised therein:

1) Does Act 62 violate the equal protection clauses of the United States and Pennsylvania constitutions?

2) Does retroactive application of Act 62 constitute a constitutionally impermissible ex post facto law?

In addition to these constitutional claims, Father asserts the statutory defenses of undue hardship and estrangement. Concluding, after careful consideration, that none of Father's claims entitles him to relief, we affirm the order of the trial court.

Elizabeth Caldwell was born to Father and appellee Kathleen M. Byrnes ("Mother") on August 18, 1974. The parties separated in 1985 and were divorced in 1989. Elizabeth has lived with Mother since the parties' separation. On April 23, 1992, Mother filed a petition requesting that Father be ordered to pay college tuition for Elizabeth. Pursuant to Pa. R.C.P. 1910.3(4), Elizabeth provided her written consent to the petition. On July 2, 1992, Father responded with a petition requesting that the trial court vacate an existing order of support as of Elizabeth's upcoming eighteenth birthday, August 18, 1992.

Elizabeth began her studies at Gwynedd Mercy College in the fall of 1992. On November 13, 1992, the Supreme Court decided *Blue*. Shortly thereafter, the trial court granted Father's petition and discharged his support obligation. Within a week of the legislature's enactment of Act 62, Mother petitioned the trial court to open or reinstate its order of support.

On February 15, 1994, following a master's hearing and a subsequent de novo hearing before the trial court, the trial court entered an order directing Father to pay the following:

1) 55% of the cost of Elizabeth's tuition, fees, books, and other educational materials, after deduction of scholarships, Father to pay this amount within thirty days after the bills for these expenses are submitted to him;

2) support in the amount of $75.00 per week while Elizabeth resides with Mother and commutes to college;

3) $50.00 per week on arrearages (i.e., Father's portion of Elizabeth's past college expenses); and

4) 55% of Elizabeth's unreimbursed medical and dental expenses.

This timely appeal followed. We note that notice of the appeal has been given to the Attorney General of the Commonwealth, as is required where the constitutionality of a statute is challenged.

## I. Non–constitutional Claims

 It is a well-settled principle that we will not decide a constitutional question unless absolutely required to do so. *Jenkins v. Hospital of the Medical College of Pennsylvania,* 401 Pa.Super. 604, 615, 585 A.2d 1091, 1096 (1991) (en banc), *aff'd,* 535 Pa. 252, 634 A.2d 1099 (1993). Accordingly, we turn to the fact-based defenses asserted by Father. If either of those claims affords him relief, we will not be required to consider his constitutional challenges to the statute. The burden is on the person asserting undue hardship, 23 Pa.C.S. § 4327(f)(1), or estrangement, 23 Pa.C.S. § 4327(e)(5), to prove his or her assertion by the fair weight and preponderance of the credible evidence. In considering such a claim, we will not disturb the determination of the trial court (i.e., the factfinder) absent an abuse of discretion. *McGettigan v. McGettigan,* 433 Pa.Super. 102, 106–07, 639 A.2d 1231, 1233 (1994) (citing *Blue*). An abuse of discretion is not merely an error of judgment; rather, it is the overriding or misapplication of the law, a manifestly unreasonable judgment, or a judgment resulting from partiality, prejudice, bias, or ill will. *Commonwealth v. Moyer,* 497 Pa. 643, 647, 444 A.2d 101, 103 (1982), quoting *Garrett's Estate,* 335 Pa. 287, 293, 6 A.2d 858, 860 (1939).

## A. Undue Hardship

 We consider, first, Father's assertion of undue hardship. Act 62 provides in pertinent part that "[a] court shall not order support for educational costs if . . . [u]ndue financial hardship would result to the parent." 23 Pa.C.S. § 4327(f)(1). The trial court found that its order would not result in undue hardship to Father.

Father has failed to persuade us that the trial court has abused its discretion in this regard. The trial court found that Elizabeth's college tuition and incidental expenses totaled approximately $11,400.00 per year and that she had obtained $4,000.00 in scholarships, leaving an amount due of $7,400.00. In addition, the trial court found that Father's net monthly income is $3,634.00. Father does not challenge these figures, but merely asserts that he will suffer undue hardship if required to pay $216.65 per month on arrears and $324.98 per month in support, as well as the lump sum of $4,070.00 per year.

Father provides us with no information concerning, inter alia, his assets, expenses, or ability to borrow. Having been given no explanation as to why the obligations set forth in the trial court's order will cause him to suffer undue hardship, we conclude that the trial court did not abuse its discretion in this regard.

## B. Estrangement

We reach the same conclusion with regard to Father's asserted defense of estrangement. As the trial court notes, one factor to be considered in deciding whether to require a parent to contribute to a child's post-secondary educational costs is "[a]ny willful estrangement between parent and student caused by the student *after attaining majority.*" 23 Pa.C.S. § 4327(e)(5) (emphasis added). Our Court has held that

[e]strangement between a parent and child will only relieve or lessen a parent's duty to pay support towards a child's college education when that parent has made a concerted and good faith effort to establish and develop a relationship with his or her child, and the child has unquestionably and willfully rejected the parent's outstretched hand.

*Fager v. Fatta,* 395 Pa.Super. 152, 156, 576 A.2d 1089, 1091 (1990) (quoting *Bedford v. Bedford,* 386 Pa.Super. 349, 358, 563 A.2d 102, 106 (1989)). In light of the legislature's stated intention to codify pre-*Blue* case law with the enactment of Act 62, we conclude that this Court's rulings on estrangement

apply to cases, such as the one before us, arising under that statute.

In the present case, the trial court found that Father "has made absolutely no effort to maintain any contact or relationship with Elizabeth since she was approximately 12 or 13 years old." Trial Court Opinion at 3. Father's testimony at the trial de novo supports this finding. Father asserts that Mother has prevented him from contacting Elizabeth and that since Elizabeth turned eighteen she has not contacted him. Even if Father's assertions are true, they do not indicate that Elizabeth, since reaching the age of eighteen, has willfully estranged herself from Father. We conclude, therefore, that Father has failed to prove an abuse of discretion concerning the issue of estrangement.

## II. Constitutional Claims

As neither of these defenses entitles Father to relief, we consider his constitutional challenges to Act 62. In doing so, we are mindful that

[a party challenging the constitutionality of a statute] carries a heavy burden of persuasion. *Consumer Party of Pennsylvania v. Commonwealth*, 510 Pa. 158, 175, 507 A.2d 323, 331 (1986). A legislative enactment enjoys a strong presumption in favor of constitutionality and will not be invalidated unless it clearly, palpably, and plainly violates the Constitution. *Id.; Parker v. Children's Hospital of Pennsylvania*, 483 Pa. 106, 116, 394 A.2d 932, 937 (1978). In determining the legislature's intent in writing the statute at issue, we presume that the legislature did not intend to violate the state or federal Constitution. 1 Pa.C.S. § 1922(3); *Krenzelak v. Krenzelak*, [503 Pa. 373, 381, 469 A.2d 987, 991 (1983) ]. All doubts must be resolved in favor of a finding of constitutionality. *Consumer Party v. Commonwealth*, 510 Pa. at 175, 507 A.2d at 332; *Parker v. Children's Hospital*, 483 Pa. at 116, 394 A.2d at 937.

*Jenkins v. Hospital*, 401 Pa.Super. at 616, 585 A.2d at 1096–97 (additional citation omitted).

## A. Retroactivity

■■■ Appellant's first constitutional claim is that insofar as Act 62 is retroactive to November 12, 1992, the day before the Supreme Court's decision in *Blue*, it is an ex post facto law and therefore violative of both the United States[1] and Pennsylvania[2] constitutions. Appellant cites no case law to support this claim. If we interpret appellant's claim narrowly, there is in fact no case law to be cited in its support, for

> the term "ex post facto" as used in the Constitutions of the United States and Pennsylvania applies *only* to penal statutes and "may be defined as [a law] which imposes a punishment for an act which was not punishable when it was committed, imposes additional punishment or changes the rules of evidence by which less or different testimony is sufficient to convict...."

*Wood v. City of Pittsburgh,* 74 Pa.Commw. 450, 460 A.2d 390, 392 (1983), quoting *Kastner v. Com., Department of Transportation,* 46 Pa.Commw. 97, 99, 405 A.2d 1133, 1134 (1979), quoting *Myers v. Lohr,* 72 Pa.Super. 472, 474 (1919) (emphasis in original). *Accord Commonwealth ex rel. Wall v. Smith,* 345 Pa. 512, 29 A.2d 912 (1942) (ex post facto law is one which makes a crime of an act which was not a crime when committed, or which increases punishment for an act already committed). Because Act 62 is civil, not penal, it cannot be an ex post facto law.

If we interpret Father's claim more broadly, as simply a constitutional challenge to the retroactivity provision of Act 62, we reach the same result. "Neither the federal constitution nor our state constitution invalidates a non-penal statute merely because it is retroactive, unless such legislation impairs contractual or other vested rights." *Barasch v. Pennsylvania Public Utility Commission,* 516 Pa. 142, 167, 532

---

1. "No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts...." U.S. Const. art. I, § 10, cl. 1.

2. "No *ex post facto* law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed." Pa. Const. art. 1, § 17.

A.2d 325, 337 (1987), *aff'd*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989), *cited in Jenkins v. Hospital, supra*, 401 Pa.Super. 604, 585 A.2d 1091. Father identifies no vested right that is impaired by the retroactive application of Act 62. We adopt as our own the trial court's analysis and resolution of this issue:

> In *Hecker v. O'Connell*, [427 Pa.Super. 608,] 629 A.2d 1036 (1993)[,] our Superior Court held that Act 62 "codified the substantive law appearing in *Ulmer v. Sommerville, [supra*, 200 Pa.Super. 640, 190 A.2d 182] and subsequent Superior Court decisions. See Preamble to Act 62. The Legislature also provided that Act 62 should be applied retroactively to November 12, 1992, one day prior to our Supreme Court's decision in *Blue*" *[supra*, 532 Pa. 521, 616 A.2d 628]. The intent of Act 62 was to reinstate and codify the Pennsylvania decisional law of almost thirty (30) years standing regarding college support. As the Superior Court held, "It is clear that the Legislature intended the statute to take effect retroactively to prevent the invalidation of college support orders entered prior to the decision in *Blue*," *Heckler* [sic], *supra*, [427 Pa.Super. at 611] 629 A.2d ... at 1037. Clearly, [Father's] potential liability for Elizabeth's college education was the law of the Commonwealth at the time she was born and it remained so until the Supreme Court's decision in *Blue* on November 13, 1992. [Father's] retroactivity argument thus must fail.

Trial Court Opinion, 2/15/94, at 5–6.

## B. Equal Protection

■ Finally, Father argues that Act 62 violates the equal protection clauses of the United States and Pennsylvania constitutions by imposing upon parents who are divorced, separated, unmarried, or subject to an existing support obligation, but not upon parents who remain married, the duty to contribute to a child's post-secondary education. For the following reasons, we conclude that this claim is without merit.

> The federal Constitution provides in pertinent part that [n]o State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any

person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1. The analogous provisions in our state Constitution are the following:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness. .

Pa. Const. art. I, § 1.

> The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law....

Pa. Const. art. III, § 32. "In the equal protection area ... we have chosen to be guided by the standards and analysis employed by the Supreme Court and have adopted those standards and analysis" in interpreting these provisions of our Constitution. *Dansby v. Thomas Jefferson University Hospital,* 424 Pa.Super. 549, 556, 623 A.2d 816, 820 (1993), quoting *Commonwealth v. Parker White Metal Co.,* 512 Pa. 74, 83, 515 A.2d 1358, 1362 (1986).

It is the case, as Father contends, that with regard to the support of college-age students the legislature has chosen to treat parents who are separated, divorced, unmarried, or otherwise subject to an existing support obligation differently from parents who remain married in an intact family situation:

> However, principles of equal protection do not absolutely prohibit a state from classifying persons differently and treating the classes in different ways. *James v. Southeastern Pennsylvania Transportation Authority,* [505 Pa. 137, 144, 477 A.2d 1302, 1305 (1984) ]. Equal protection requires that uniform treatment be given similarly situated parties. If distinctions are drawn, then the challenged policy must be reasonably justified. The level of justification required will depend upon the type of classification drawn and the governmental interest in promulgating the classification, and the relationship between that interest and the classification

itself. *Smith v. City of Philadelphia,* 512 Pa. 129, 137–138, 516 A.2d 306, 310–311 (1986).

*Dansby v. Thomas Jefferson,* 424 Pa.Super. at 557, 623 A.2d at 820.

 In considering an equal protection challenge, our standard of review depends upon the type of classification at issue. A classification involving a suspect class or a fundamental right will be subject to strict scrutiny, the most stringent standard of review. A classification involving a sensitive classification or an important but not fundamental right will be subject to intermediate or heightened scrutiny. Finally, if none of these rights or classes are involved, the classification is subject to the least stringent standard of review and will be upheld if there is any rational basis for it. *Id.* at 557, 424 Pa.Super. at 820–21, quoting *Smith v. Philadelphia,* 512 Pa. at 138, 516 A.2d at 311; *see also James v. SEPTA, supra,* 505 Pa. 137, 477 A.2d 1302.

Although the type of classification at issue is crucial to our analysis, Father's argument on this point is minimal. He maintains that

> his status as a divorced father would allow him to come within the "suspect class" type of cases, therefore, requiring this Court to conduct a review based on strict scrutiny. In the alternative, [he] believes that an "important" interest has been affected and that a sensitive, if not suspect, classification has been made, thereby entitling him to have this matter reviewed under a "heightened standard of review."

Brief for Appellant at 8. Father cites no case law to support this argument, nor does he identify the "important" interest involved or explain why divorced fathers constitute a suspect or sensitive class. Bearing in mind the presumption of constitutionality to be accorded Act 62, we decline to apply to the Act a strict or heightened level of scrutiny where no persuasive reason has been given us for doing so.

Accordingly, we consider whether Act 62 passes the rational basis test. In other words, is Act 62 "rationally related to a legitimate state purpose"? *In re Estate of Long,* 410 Pa.Su-

per. 607, 611, 600 A.2d 619, 620 (1992), citing *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *In re Estate of Cavill*, 459 Pa. 411, 329 A.2d 503 (1974). The United States Supreme Court has observed that

equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is *any reasonably conceivable state of facts* that could provide a rational basis for the classification.... This standard of review is a paradigm of judicial restraint.

*F.C.C. v. Beach Communications, Inc.*, —— U.S. ——, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (citations omitted; emphasis added).

Included in Act 62 is the following statement of purpose:

[T]he General Assembly finds that it has a rational and legitimate governmental interest in requiring some parental financial assistance for a higher education for children of parents who are separated, divorced, unmarried or otherwise subject to an existing support obligation.

In the legislative debate on Act 62, Representative Ryan offered an explanation as to why a statute was necessary to further that interest:

I read an article in the paper not too long ago.... There were 80 petitions filed in Montgomery County in the first 2 months, to my recollection, the first 2 months after the Blue case came down in November, and these were cases where, for the most part, fathers were filing petitions so they would not have to pay the tuitions of their children to go to college the following semester, and that is just wrong. It is the wrong thing to do.

We have tuitions coming due this summer, we have children making plans to go back to school this fall, and I think it is wrong for us not to address the issue now. I

think it is wrong for us not to go back to the law the way it was for the 30, 40 years that preceded the Blue case. . . .

Legislative Journal, House, June 24, 1993, p. 1689.

The trial court, citing the persuasive reasoning of the Supreme Court of New Hampshire in *LeClair v. LeClair,* 137 N.H. 213, 624 A.2d 1350 (1993), analyzed the matter as follows:

I agree with the *LeClair* court that college education for capable students is a worthy social goal. I also conclude that the Legislature could rationally conclude that children of divorced, separated or unmarried parents are generally, but not inevitably, in greater need for protection in their pursuit of college education than are children of intact marriages. Economic retaliation, bitterness, even hatred, must be acknowledged as frequently at work in such situations. Intact families on the other hand most often, but not inevitably, will struggle and sacrifice to provide their children with higher education. . . . Act 62 also reflects the historic tradition in our law that courts will not interfere with the economic decisions of intact families. *See Commonwealth v. George,* 358 Pa. 118, 56 A.2d 228 (1948)[;] *Shilling v. Shilling,* 394 Pa.Super. 154, 575 A.2d 145 (1990). Divorce, separation or unmarried status, however, frequently results in the intervention of the courts with regard to economic issues, i.e., support, equitable distribution of marital property, et cetera, for the purpose of mitigating harm to the parties and serving the best interest and welfare of children. Given these realities and this long standing tradition of our law, it cannot be said that there is no rational basis for the Legislature's determination, as reflected in Act 62, to regard children of divorced, separated or unmarried parents as worthy of special protection as against the "fall out" of divorce or separation.

Trial Court Opinion, 2/15/94, at 4–5.

Mindful of the United States Supreme Court's instruction that our review of such a statute shall be a model of judicial restraint, we conclude that both the pertinent legislative history and the trial court's analysis, quoted above, suggest a

"reasonably conceivable state of facts" which can serve as a rational basis for treating intact and non-intact families differently with regard to the support of adult children seeking post-secondary education. In reaching this conclusion, we do not disagree with Father's assertion that many divorced or separated parents put aside their personal animosities for the sake of their children, nor do we dispute Father's claim that Act 62 does not instruct the trial court to duplicate as nearly as possible the decision that would have been made regarding the child's post-secondary education if the family had remained intact. Nevertheless, a classification may be rational even though it "is not made with mathematical nicety or because in practice it results in some inequality." *Martin v. Com., Unemployment Compensation Board of Review,* 502 Pa. 282, 291, 466 A.2d 107, 111 (1983), *cert. denied,* 466 U.S. 952, 104 S.Ct. 2156, 80 L.Ed.2d 541 (1984), quoting *Dandridge v. Williams,* 397 U.S. at 485, 90 S.Ct. at 1161. Accordingly, we conclude that Act 62 "bears some rational relationship to a legitimate state end," *id.,* and therefore does not violate the state and federal guarantees of equal protection.

Order affirmed.

CIRILLO, J., files a dissenting opinion, which is joined by CAVANAUGH, J.

CIRILLO, Judge:

I respectfully dissent. Unlike the majority, I conclude that Act 62, which imposes a duty of postsecondary educational support upon divorced parents,[1] is unconstitutional on equal protection grounds. I, therefore, would reverse the trial court's order directing Father to contribute to Elizabeth's postsecondary education.

1. The term "divorced parents" will hereinafter refer to all parents to which Act 62 is applicable, including unmarried parents or separated parents subject to a support agreement, support order, property settlement agreement, equitable distribution agreement, custody agreement and/or court orders and agreed to or stipulated court orders. *See* 23 Pa.C.S. § 4327(i)(1).

The equal protection clause is a pledge of the protection of equal laws, and its requirement is satisfied if the laws operate on all alike and do not subject the individual to an arbitrary exercise of the powers of government. U.S. Const. amend. XIV; Pa. Const. art. I, §§ 1 and 26, art. III, § 32; *Application of Christy*, 362 Pa. 347, 67 A.2d 85, *cert. denied, Christy v. Conver*, 338 U.S. 869, 70 S.Ct. 145, 94 L.Ed. 533 (1949). The concept of equal protection requires that uniform treatment be given to similarly situated individuals. *Smith v. City of Philadelphia*, 512 Pa. 129, 136–37, 516 A.2d 306, 310 (1986). If distinctions are drawn, the challenged policy must be reasonably justified. The level of justification depends upon the type of classification drawn and the governmental interest in promulgating the classification, and the relationship between that interest and the classification itself. *Id.* at 137–38, 516 A.2d at 310–11.

> The types of classifications are: (1) classifications which implicate a "suspect" class or a fundamental right; (2) classifications implicating an "important" though not fundamental right or a "sensitive" classification; and (3) classifications which involve none of these. *Id.* Should the statutory classification in question fall into the first category, the statute is strictly construed in light of a "compelling" governmental purpose; if the classification falls into the second category, a heightened standard of scrutiny is applied to an "important" governmental purpose; and if the statutory scheme falls into the third category, the statute is upheld if there is any rational basis for the classification.

*Id.* at 138, 516 A.2d at 311.

Here, the group affected, divorced parents, is not a "suspect" or "sensitive" class. The right infringed, an economic right, is not deemed "fundamental" or "important." As the majority has done in its evaluation of this issue, I, therefore, utilize the lowest level of scrutiny—the rational basis test. The statute must be sustained if it bears a rational relationship to a legitimate state interest. *Singer v. Sheppard*, 464 Pa. 387, 346 A.2d 897 (1975); *Dansby v. Thomas Jefferson*

*University Hospital,* 424 Pa.Super. 549, 553–54, 623 A.2d 816, 819 (1993).

Although this court is free to interpret our Constitution in a more generous manner than the federal Constitution, *Fischer v. Department of Public Welfare,* 509 Pa. 293, 305, 502 A.2d 114, 211 (1985), "[i]n the equal protection area ... we have chosen to be guided by the standards and analysis employed by the [United States] Supreme Court and have adopted those standards and analysis ... [in interpreting our Constitution]." *Dansby,* 424 Pa.Super. at 556, 623 A.2d at 820 (quoting *Commonwealth v. Parker White Metal Co.,* 512 Pa. 74, 83, 515 A.2d 1358, 1362 (1986)).

As early as 1765, Blackstone aptly summarized the rationale underlying the parental duty of support:

> The duty of parents to provide for the maintenance of their children, is a principle of natural law. . . . By begetting them, therefore, they have entered into a voluntary obligation, to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have a perfect right of receiving maintenance from their parents.

1 W. Blackstone, Commentaries on the Law of England 447–448 (1765). "Maintenance in 1765, however, did not extend far beyond food, clothing and shelter." *Spitzer v. Tucker,* 404 Pa.Super. 539, 545, 591 A.2d 723, 726 (1991) (Cirillo, P.J., dissenting). In 1992, the Pennsylvania Supreme Court determined that the duty of support extended to a "basic education," defined as a high school education, or until a minor reaches the age of eighteen, whichever occurs later. *Blue v. Blue,* 532 Pa. 521, 616 A.2d 628 (1992). The Court stated:

> In recent history, the Superior Court has adopted and applied the [*Commonwealth v.*] *Gilmore,* [97 Pa.Super. 303 (1929) ] analysis to college educational support of a child. In essence, the Superior Court has transferred this "principle of necessity" of a basic fundamental education to a

requirement that each child be entitled to an "enhanced" education. We do not agree with this transformation. *Id.* at 529, 616 A.2d at 632.

Act 62, which in effect negated the Supreme Court's decision in *Blue,* and is applicable only to divorced parents, imposes upon that class of parents an obligation to provide financially for an adult child's college or postsecondary education.[2] Nondivorced parents have no coextensive legal obli-

2. Act 62 provides:

**§ 4327. Postsecondary education costs**

(a) **General rule.**—Where applicable under this section, a court may order either or both parents who are separated, divorced, unmarried or otherwise subject to an existing support obligation to provide equitably for educational costs of their child whether an application for this support is made before or after the child has reached 18 years of age. The responsibility to provide for postsecondary educational expenses is a shared responsibility between both parents. The duty of a parent to provide a postsecondary education for a child is not as exacting a requirement as the duty to provide food, clothing and shelter for a child of tender years unable to support himself. This authority shall extend to postsecondary education, including periods of undergraduate or vocational education after the child graduates from high school. An award for postsecondary educational costs may be entered only after the child or student has made reasonable efforts to apply for scholarships, grants and work-study assistance.

(b) **Action to recover educational expenses.**—An action to recover educational costs may be commenced:

(1) by the student if over 18 years of age;

(2) by either parent on behalf of a child under 18 years of age, but, if the student is over 18 years of age, the student's written consent to the action must be secured.

(c) **Calculation of educational costs.**—In making an award under this section, the court shall calculate educational costs as defined in this section.

(d) **Grants and scholarships.**—The court shall deduct from the educational costs all grants and scholarships awarded to the student.

(e) **Other relevant factors.**—After calculating educational costs and deducting grants and scholarships, the court may order either parent or both parents to pay all or part of the remaining educational costs of their child. The court shall consider all relevant factors which appear reasonable, equitable and necessary, including the following:

(1) The financial resources of both parents.

(2) The financial resources of the student.

(3) The receipt of educational loans and other financial assistance by the student.

(4) The ability, willingness and desire of the student to pursue and complete the course of study.

gation to provide support for their child's postsecondary education.

The child of nondivorced parents may find a way to finance the postsecondary education of his or her choice, or may not. Nondivorced parents will, as is most often the case, do whatever is necessary, even at a sacrifice, to provide their child with the best that they can offer, or they may not. This is not for us to question, and so far as this court or the lawmakers have ventured into this personal, financial family matter, we have intruded. *Milne v. Milne*, 383 Pa.Super. 177, 186–87, 556

(5) Any willful estrangement between parent and student caused by the student after attaining majority.

(6) The ability of the student to contribute to the student's expenses through gainful employment. The student's history of employment is material under this paragraph.

(7) Any other relevant factors.

**(f) When liability may not be found.**—A court shall not order support for educational costs if any of the following circumstances exist:

(1) Undue financial hardship would result to the parent.

(2) The educational costs would be a contribution for postcollege graduate educational costs.

(3) The order would extend support for the student beyond the student's twenty-third birthday. If exceptional circumstances exist, the court may order educational support for the student beyond the student's twenty-third birthday.

**(g) Parent's obligation.**—A parent's obligation to contribute toward the educational costs of a student shall not include payments to the other parent for the student's living expenses at home unless the student resides at home with the other parent and commutes to school.

**(h) Termination or modification of orders.**—Any party may request modification or termination of an order entered under this section upon proof of change in educational status of the student, a material change in the financial status of any party or other relevant factors.

**(i) Applicability.**—

(1) This act shall apply to all divorce decrees, support agreements, support orders, agreed or stipulated court orders, property settlement agreements, equitable distribution agreements, custody agreements and/or court orders and agreed to or stipulated court orders in effect on, executed or entered since, November 12, 1992.

**(j) Definitions.**—As used in this section, the following words and phrases shall have the meanings given to them in this subsection: "Educational costs." Tuition, fees, books, room, board and other educational materials.

"Postsecondary education." An educational or vocational program provided at a college, university or other postsecondary vocational, secretarial, business or technical school.

23 Pa.C.S. § 4327, 1993, July 2, P.L. 431, No. 62, § 3, imd. effective.

A.2d 854, 859–60, *appeal denied,* 524 Pa. 598, 568 A.2d 598 (1989). Just as parents in an intact family enjoy the freedom of making the personal decision of whether and to what extent to provide postsecondary educational support for their child, free from interference or mandates by the courts or laws of the Commonwealth, so too should divorced parents be free to manage this matter on their own. Regardless of the bitterness or hatred between ex-husband and ex-wife, it is the husband/wife relationship that has been severed, not the parent/child relationship. As such, neither this court nor the legislature has been called upon to delve into this matter. *See generally,* Horan, *Postminority Support for College Education—A Legally Enforceable Obligation in Divorce Proceedings?* 20 Fam.L.Q. 589 (1987) (indicating that the underlying sentiment in decisions refusing to impose a duty of postminority support is that a system of voluntary support to adult children is more likely to foster a close relationship between parents and children).

If we momentarily humble ourselves, we may clear our vision sufficiently to acknowledge that interference in these matters may have fostered bitterness, providing legal weapons for mother and father, and encouraging the depletion of the family's financial resources. *See Milne,* 383 Pa.Super. at 188, 556 A.2d at 860 ("to the extent that the courts of this Commonwealth impose obligations on divorced parents without expecting commensurate responsibilities and respect from adult children, we add to the family's problems rather than alleviate them."). Our Supreme Court recognized this in its decision to eradicate over thirty years of decisional law. *See Blue, supra; see also Monsky v. Sacks,* 403 Pa.Super. 40, 588 A.2d 19 (1991); *Napier v. Hutchinson,* 397 Pa.Super. 162, 579 A.2d 981 (1990); *Pharoah v. Lapes,* 391 Pa.Super. 585, 571 A.2d 1070 (1990); *Bedford v. Bedford,* 386 Pa.Super. 349, 563 A.2d 102 (1989); *Griffin v. Griffin,* 384 Pa.Super. 188, 558 A.2d 75 (1989); *Milne, supra; Chesonis v. Chesonis,* 372 Pa.Super. 113, 538 A.2d 1376 (1988); *Fortune/Forsythe v. Fortune,* 352 Pa.Super. 547, 508 A.2d 1205 (1986); *Commonwealth ex rel. Williams v. Williams,* 242 Pa.Super. 550, 364

A.2d 410 (1976); *Doelp v. Doelp,* 219 Pa.Super. 420, 281 A.2d 721 (1971); *Commonwealth ex rel. Ulmer v. Sommerville,* 200 Pa.Super. 640, 190 A.2d 182 (1963).

Furthermore, Act 62 magnifies the distinction of the divorced family by ignoring the realities of an intact family. It simply is not always the case that nondivorced parents agree on expenditures for postsecondary education for their children, nor is it always the case that nondivorced parents and the child agree on the matter. Nondivorced parents will settle this matter without legislative interference; divorced parents, on the other hand, will be ordered to provide as the legislature and the courts see fit. Nondivorced parents have the option to withhold support; divorced parents do not.

It is this author's opinion, after many years of experience as a parent, a lawyer, a trial court judge, and an appellate court judge, that high school graduates who have prepared themselves for college by working hard for good grades in their classes and good scores on the scholastic aptitude tests, and who have endeavored to work in the summer to aid in the expense of postsecondary education, are rarely turned away by a parent who is respectfully asked to contribute to his or her postsecondary education. The key to this problem is to recognize that the love, respect and humility that a child owes and gives to his or her parents will usually control the volitional contributions made by a non-obligated divorced parent.

I find, therefore, that Act 62 differentiates between parents similarly situated and that this classification bears no reasonable relationship to a legitimate legislative purpose. *Application of Christy, supra,* 362 Pa. 347, 67 A.2d 85; *Dansby, supra,* 424 Pa.Super. 549, 623 A.2d 816; *see also McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Act 62, which codifies this court's pronouncements beginning with *Ulmer v. Sommerville, supra,*[3] 200 Pa.Super. 640, 190 A.2d 182, frustrates the legislative

3. The Historical and Statutory Notes to Act 62 provides in part:

It is the intention of the General Assembly by enacting 23 Pa.C.S. § 4327 (relating to postsecondary educational costs) to codify the decision of the Superior Court in the case of *[Commonwealth ex rel.] Ulmer v. Sommerville,* 200 Pa.Super.Ct. 640, 190 A.2d 182 (1963),

purpose to assure children of divorced parents a postsecondary education.[4] History should teach us that the children of divorced parents may fare better without heightened interference, and humility should enable us to look back on the past thirty years and honestly assess the utility our pronouncements have had in these skirmishes. "It is by practical experience and not by theoretical inconsistencies that the question of equal protection is to be decided." *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 110, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949). As one commentator has noted:

> [I]n a free society the law should force **one adult to subsidize another only in compelling circumstances;** and, a young adult's desire to attend college, however laudable it may be, cannot reasonably be said to meet this test. If the ambition and aptitude are present, it is probable that the aspiring student will find a way to obtain [an] education without making his [or her] reluctant and financially-pressed parent help pay for the same; and, such a graduate will have attained, along with [a] degree, an appreciation of what industriousness and self-discipline can accomplish.

Moore, *Parents' Support Obligations to Their Adult Children*, 19 Akron L.Rev. 183, 184 (1985).

I discern no rational basis for compelling divorced parents to pay for their adult child's postsecondary education where no similar obligation lies with non-divorced parents. It is with the foregoing in mind that I conclude that Act 62, which

and the subsequent line of cases interpreting *Ulmer* prior to the decision of the Pennsylvania Supreme Court in *Blue v. Blue*, 532 Pa. 521, 616 A.2d 628 (1992), decided on November 13, 1992.

**4.** I emphasize that the Act speaks solely to adult children and postsecondary educational support. Neither the Act nor this opinion refers in any way to support for minor children or children in high school. It is well settled that the duty to support a minor child is virtually absolute. *Sutliff v. Sutliff*, 339 Pa.Super. 523, 537, 489 A.2d 764, 771 (1985), *modified on appeal*, 515 Pa. 393, 528 A.2d 1318 (1987). Further, I acknowledge that children are innocent parties, often innocent victims, in a divorce, and it is the obligation of the courts to protect them. This protection, however, terminates at adulthood. *Blue, supra.*

596

imposes a duty of postsecondary educational support upon divorced parents where no similar obligation exists for married parents, is unconstitutional on equal protection grounds. *Application of Christy, supra,* 362 Pa. 347, 67 A.2d 85; 16A Am.Jur.2d, Constitutional Law, §§ 735–738 (1979); 7A P.L.E. Constitutional Law, § 241 (1980). *See* Moore, *Parents' Support Obligations to Their Adult Children,* 19 Akron L.Rev. 183, 192 (1985) (presenting the argument that compelling divorced parents but not married parents to pay post-minority support is a violation of equal protection). *Cf. Dillard v. Dillard,* 104 N.M. 763, 727 P.2d 71 (App.1986) (trial court acted beyond its statutory authority in ordering support for children's educational needs past the age of eighteen). *But see LeClair v. LeClair,* 137 N.H. 213, 624 A.2d 1350 (1993); *Neudecker v. Neudecker,* 566 N.E.2d 557 (Ind.App.2 Dist. 1991), *aff'd,* 577 N.E.2d 960 (Ind.1991); *Kujawinski v. Kujawinski,* 71 Ill.2d 563, 17 Ill.Dec. 801, 376 N.E.2d 1382 (1978). For this reason, I would reverse the trial court's order.

CAVANAUGH, J., joins.